## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **POST, LLC** | * | |
| 1818 New York Avenue, NE | | |
| Washington, D.C.  20002 | * | |
| | | |
| **Plaintiff,** | * | |
| | | |
| **v.** | * | **Case No. _____** |
| | | |
| **and** | * | |
| | | |
| **BERKSHIRE HATHAWAY SPECIALTY** | * | |
| **INSURANCE COMPANY** | | |
| 1314 Douglas Street, Suite 1400 | * | |
| Omaha, NE  68102 | | |
| | * | |
| | | |
| **Defendants.** | * | |

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*

## COMPLAINT FOR BREACH OF PAYMENT BOND AND JURY DEMAND

Plaintiff, POST, LLC ("POST"), by undersigned counsel, files this Complaint and Jury Trial Demand against Defendant, Berkshire Hathaway Specialty Insurance Company ("BHSIC"), and for its cause of action POST states as follows:

### The Parties And Jurisdiction

1.      POST is a District of Columbia limited liability company with its principal place of business located at 1818 New York Avenue, NE, Washington, D.C.  Alvin Smith is the sole member of POST, who is a citizen and resident of the State of Maryland.

2.      Defendant BHSIC is a compensated surety having provided a payment and performance bond binding itself to pay claimants having furnished labor and materials to the hereinafter described construction project.  Upon information and belief, BHSIC is a Nebraska corporation and, at minimum, is neither headquartered, organized or domiciled within the State

of Maryland, thereby preserving complete diversity of citizenship between Plaintiff and BHSIC.

3.      Subject matter jurisdiction of this Court arises under 28 U.S.C. § 1332, as Plaintiff and Defendant BHSIC are diverse in citizenship and the matter in controversy exceeds $75,000.00.  Venue is appropriate in this District pursuant to 28 U.S.C. § 1391, as Defendant is subject to the personal jurisdiction of this Court in that it regularly transacts business within the territorial jurisdiction of this Court, including but not limited to issuing payment and performance bonds for construction projects within the territorial jurisdiction of this Court, including, *inter alia,* 6676 Georgia Avenue, NW, Washington , DC 20012 also known as the Takoma Place Apartments construction project (hereinafter the "Project").

**Factual Background**

4.      This action involves construction work performed at and about the Takoma Place Apartments construction project.  Upon information and belief, the aforesaid Project is located upon real property owned and/or leased by Takoma Place Investors, LLC ("TPI"), an arm of The NHP Foundation (hereinafter "NHPF").

5.      Takoma Place Apartments was originally constructed in 1953, adjacent to the-then Walter Reed Army Hospital Campus in Northwest D.C.

6.      Upon information and belief, NHPF acquired the property in 2017 for $16.5 million through the District of Columbia's Tenant Opportunity to Purchase Act ("TOPA").

7.      Upon further information and belief, NHPF is undergoing a $31.7 million rehabilitation of the seven four story apartment buildings, transforming the property into over 3 million square feet of mixed-use development.  According to NHPF's website, all Takoma Place Apartments residents receive rental subsidies through a Housing Assistance Payment contract with HUD.

8.      Upon information and belief, NHPF, by and through TPI, entered into a construction contract with WCS Construction, LLC (hereinafter "WCS"), pursuant to which WCS was to provide general contractor services for the renovation of 106 apartments, a leasing office and a community center in seven buildings at the Project in exchange for $12,261,027.00 (hereinafter the "Prime Contract").

9.      Thereafter, on or about January 24, 2019, WCS contracted with POST, LLC, a District of Columbia Certified Business Entity (hereinafter "CBE"), for certain masonry restoration and related work at the Project in the aggregate amount of $842,000 scheduled to begin immediately (hereinafter the "Subcontract").

10.      The Subcontract provided, *inter alia*, that WCS may require POST to make certain changes in the work of the Subcontract, for which POST may submit a written proposal for any applicable price or time adjustments attributed to the changed work.  The Subcontract provided, however, that in no event shall POST proceed with any changed Work without a written change order issued and signed by WCS.

11.      Upon information and belief, the subcontracts between WCS and POST were for the purpose of meeting part or all of a 50% CBE subcontracting requirement at the Project.

12.      POST is owned by Alvin Smith, an African-American resident of the District of Columbia.  The make-up of POST's employee roster is virtually entirely African-American, as are the subcontractors it regularly contracts with.

13.      Upon information and belief, at the time WCS executed the subcontract with POST, WCS was severely behind schedule at the Project.

14.     However, at the time the subcontract was executed in January, 2019, WCS hid and did not disclose the existing schedule delays to POST, and hid and did not disclose that it did not maintain a good working relationship with the Owner of the Project.

15.     Thereafter, WCS was not prepared for POST's masonry restoration work to begin at the Project until many weeks later.

16.     Rather, WCS provided POST with a change order in the amount of $176,000 to perform additional work at the Project, including necessary precedent work to POST's masonry restoration work, including demolition work and site concrete work (hereinafter CO #1).  CO #1 was calculated, in part using the following agreed upon labor rates:

Mason/Bricklayer:     $63/hour

Laborer:               $39/hour

Supervision:           $70/hour

17.     Per the contract, POST expected to construct its masonry scope of work one building at a time until all seven buildings were completed.    However, in an effort to make up for WCS' prior schedule slip, POST was asked by WSC's then project manager, Kari Ludtke, to run two simultaneous building restorations, necessitating additional scaffolding, labor and associated equipment costs.  POST indicated a change order would be necessary to cover the additional costs of scaffolding and labor, and Ms. Ludtke issued the requested change order, at the agreed upon labor rates.

18.     Shortly thereafter, David Jones, a recently hired WSC Vice President, inserted himself within the chain of command at the Project.  Mr. Jones questioned and reversed decisions made by Ms. Ludtke, and routinely and consistently made decisions adverse to the interests of POST at and about the Project.

19.     For example, despite the existence of written subcontracts by and between POST and WCS setting forth clearly identifiable scopes of work of POST and providing that the means and methods employed were to be the sole decision of POST, Mr. Jones treated POST and its employees as WCS' own personal crew, demanding that POST perform work not shown on the drawings and/or not within the scope of the POST subcontract, in the progression that Jones demanded, per the means and method dictated by Jones, immediately, at the whim and pleasure of Jones, and at no additional charge.

20.     For example, Jones would consistently rescind, alter and modify POST's pay applications downwards, even after they were approved during the ordinary course of dealing by and between the respective WCS and POST field and accounting departments.

21.     In addition, Jones would demand that POST perform different work than it was currently performing and out-of-sequence with the Project's performance schedule, as created and circulated by WCS, and would consistently berate POST for not working hard or fast enough.   Yet, when POST would submit proposed change orders per the subcontract procedures, Jones would refuse to entertain any such change orders, treating POST as his own indentured labor crews.

22.     Moreover, POST, notwithstanding having by far had the most employees and subcontractor partners at the site working from the time it was mobilized, was maligned, berated and denigrated for not having sufficient manpower onsite and for delaying the orderly progression of work at the Project.

23.     In addition, Jones refused to honor the previously agreed upon labor rates for POST change orders at the Project, and enforced a significant reduction thereto.

24.     Furthermore, Jones refused to honor prior commitments made by WCS to POST, for example, the waiver of the bond requirement.

25.     Jones repeatedly demanded that POST work evenings and weekends at no additional cost to WCS.

26.     Furthermore, Jones assigned a dedicated safety observer to follow POST crews and employees around the Project to hunt for alleged safety violations.  Upon information and belief, the purpose of this safety observer was to find pretextual "violations" to discipline POST and, ultimately, to support a termination of POST from the Project.  Ultimately, Jones would argue with both the WCS safety observer as well as OSHA inspectors who came to the Project site, both of whom agreed there were no safety violations on POST's part, with Jones arguing that there were POST safety concerns.

27.     Upon information and belief, including by his own admission, Mr. Jones was brought onto the Project "just for POST" – i.e., to intimidate, harass and ultimately, to attempt to terminate POST.

28.     Mr. Jones made repeated humiliating, degrading and demeaning statements directed toward POST and its President, Alvin Smith, including "just be quiet," "you don't know what you are talking about," and repeated threats that "I'll get someone else to do your work"  if POST and Mr. Smith did not do precisely what Jones demanded.

29.     The treatment of POST employees by WCS management was disparate from the treatment of others at the Project – POST employees were singled out for shame, torment, oppression, humiliation and intimidation.

30.     Specifically, WCS did not assign a dedicated taskmaster to any other trade partner at the Project other than POST to maliciously harangue and harass, nor was any other trade partner at the Project demeaned, insulted and denigrated.

31.     In addition, Jones and WCS management failed and refused to pay POST for its work performed, including both base subcontract work, approved changed order work and additional, changed and extra work performed at the direction of WCS and/or Jones.

32.     Ultimately, upon information and belief, Mr. Jones replaced POST with a Caucasian-owned organization to do the work previously assigned to POST.

33.     Rather, at each time a payment was due and/or POST management would ask WCS to issue payment to POST, WCS would issue to POST a pretextual, bald "Notice of Default" with generic boilerplate averments of default, such as "failure to prosecute the work" and "failure to furnish sufficient manpower," despite the obvious fact that POST was the only clear subcontractor working and supplying manpower to the Project.

34.     In addition, WCS, through Jones, would make unilateral, pretextual changes to POST's payment applications, notwithstanding WCS's earlier approval of the very same pay applications, and would seek reductions from the pay applications for POST's work.

35.     Upon information and belief, payment was not withheld in a similar manner from WCS' other, non African-American trade subcontractors, and only POST was singled-out for disparate treatment in this regard.

36.     In this manner, throughout the performance of its work at the Project following Jones involvement, POST was bullied, harassed, intimidated, and made to feel inferior to WCS and the other non-African American trade subcontractors working at the Project, all without ever

getting paid for hundreds of thousands of dollars of construction work performed at the demand of Jones and WCS.

## COUNT I
### (Breach of Payment Bond)

37.     POST realleges paragraphs 1 through 36 above as though fully set forth herein.

38.     This is an action against BHSIC on the Payment Bond it provided for the Project, for POST's unpaid work performed and unpaid labor, material and services provided on the Project, which totals at least $305,271.24.  As a contractor supplying labor, material and related services to the Project, POST is a proper claimant under the Payment Bond.

39.     Pursuant to the Payment Bond and other applicable law, BHSIC is liable to POST for the unpaid work performed and the unpaid labor, materials and services POST provided at, on and about the Project, in the amount of at least $305,271.24.

**WHEREFORE**, POST, LLC demands judgment be entered against Defendant, Berkshire Hathaway Specialty Insurance Company, for damages in an amount not less than $75,000 plus interest, attorney's fees and the costs of these proceedings.

Respectfully submitted,

**KATZ LAW**

BY:     /s/ Joseph L. Katz
Joseph L. Katz  MD# 28029
6701 Democracy Boulevard, Suite 300
Bethesda, Maryland  20817
(410) 499-2615
joe@joekatzlaw.com

**Attorneys for Plaintiff
POST, LLC**

8

## JURY DEMAND

Plaintiff hereby requests a trial by jury on all counts.

Respectfully submitted,

**KATZ LAW**

BY:   */s/ Joseph L. Katz*
      Joseph L. Katz  MD# 28029